[S. F. No. 15166.   In Bank.—December 29, 1934.]

RAINE EWELL, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Raine Ewell, *in pro. per.*, for Petitioner.

Philbrick McCoy for Respondent.

SEAWELL, J.—This is a proceeding instituted for the purpose of reviewing the action of the board of governors of The State Bar of California in recommending the suspension of petitioner as an attorney at law of this state for the period of one year.

On May 25, 1933, local administrative committee No. 2 for the city and county of San Francisco, pursuant to the provisions of the State Bar Act regulating the practice of law and providing penalties for the violation of said act, issued an order directed to Raine Ewell to appear on June 13, 1933, before local administrative body No. 5 and show cause why he should not be disciplined for professional misconduct alleged to have consisted in the violation of rule 2, which in terms provides that "a member of The State Bar shall not solicit professional employment by advertisement or otherwise". The specific acts as alleged in the notice to show cause, briefly stated, were that prior to May 1, 1933, Eugene H. O'Donnell, a practicing attorney of the city and county of San Francisco, had been retained by Meta Corville to defend one Herschell Rutherford, who was imprisoned in county jail No. 1, upon a commitment by a magistrate to answer to the charge of robbery. It is charged in said notice that after said Rutherford had been held to answer and before trial petitioner Raine Ewell while a visitor at said jail and without any request from said Rutherford, or anyone in his behalf, to visit or communicate with said Rutherford, requested and caused said Rutherford to be brought from his cell into his presence and he thereupon stated to said Rutherford that he specialized in the practice of criminal law and he could help him gain his liberty; that he was certain to go to San Quentin if he allowed his present attorney to defend him, since he was a civil lawyer and not experienced in criminal procedure. It was further alleged that Rutherford refused to employ him and that petitioner called upon Meta Corville on the same evening and repeated to her the same statement as to Mr. O'Donnell's inexperience in criminal law which he had made to Rutherford. Petitioner was given five days to answer after service of said notice. Within said period he filed a verified answer to said notice in which he denied that he had any acquain-

tance whatever with Mr. O'Donnell and denied that he requested to see said Rutherford in regard to his or any matter whatsoever; denied that he told Rutherford that he specialized in criminal law or that he could help him obtain his liberty; or that he was certain to go to San Quentin if he retained his present attorney; denied that he had been advised or knew that Mr. O'Donnell was representing Rutherford or that he said any of the things set forth in the notice as to the lack of experience on the part of O'Donnell in handling criminal cases; denied that he solicited employment or that Rutherford had refused to employ him.

As a further defense the accused averred that on or about April 24, 1933, he was given a card by another inmate of county jail No. 1, on which was written the name Herschell Rutherford, and the person who gave him the card containing Rutherford's name said that Rutherford requested the accused to call him out as he wished to talk with Ewell; that in response to said card and request he called Rutherford out; that Rutherford said to him he wanted to talk about his case and upon being asked by Rutherford if he was a criminal lawyer he replied that "that was all he did". Rutherford then told him he had been in jail since April 13th and had not been able to have any communication with a lawyer; that he was supposed to have an attorney hired to defend him, but that his attorney had never called on him since he had been held to answer, and he did not know whether he was going to represent him or not; that he was charged with robbery committed with the aid of two others with the use of a gun that belonged to him; that he had lived or boarded at the home of Meta Corville and her mother for four years; that he drove his Packard car to the place of robbery and remained in it while his companions actually committed the robbery; that he explained to Rutherford that robbery by the use of a deadly weapon was punishable from five years to life in the state penitentiary, and probation, in cases where a deadly weapon was used, was not available to the accused; that Rutherford asked him to go to the home of Miss Meta Corville, giving him her street number, and to request her to call and see him; that Miss Corville resided in the district through which petitioner passed on his way home; that he called upon Miss Corville as he was going to his home and she said to him that Mr.

O'Donnell was her attorney and was taking care of Rutherford's case; that he said to her: ''Well, he asked me to please tell you to come tomorrow and see him''; that accused made no reference to Mr. O'Donnell, or comment upon his legal experience whatever and did not ask to be employed on the case. Proceedings where had and, as shown by the local administrative committee entry, the matter was entirely heard and submitted on June 13, 1933. On February 6, 1934, approximately eight months after said matter was heard and submitted, the committee filed its findings of fact, conclusion and recommendation that the accused be disbarred.

At the close of the hearing on June 13, 1933, the accused, insisting that the testimony of Rutherford in particular in accusatory matters was false and was influenced by his desperate effort to obtain probation, which was subsequently granted, requested permission to reopen the case for further hearing. Several similar requests were made during said eight months' period to reopen the case. On December 18, 1933, the accused was notified by respondent that no adequate showing had been made to reopen the case and his request was denied.

There is no suggestion as to the particular in which the showing was inadequate. It appears from the verified statement of the accused filed in opposition to the report of the committee, that on June 15, 1933, the second day after the order of submission was made by said committee, he applied in writing to said committee to set aside said order of submission and reopen the case; that he explained in detail to the chairman of said committee the existence of evidence which would rebut the alleged false testimony given by Rutherford, and a certain named witness discovered by the accused since the cause was submitted, and that additional testimony material to his defense had come to his notice which he asked to introduce, including the testimony of Mock Jock, a Chinese, who had been transferred from the San Francisco jail to the Santa Clara County jail to serve a term on a misdemeanor charge. Mock Jock was unquestionably a material witness for the accused to the point that Rutherford actually wrote his own name on a card and caused it to be delivered by Mock Jock to the accused requesting him to call upon Rutherford. The accused avers

that he was informed by the chairman of the committee that he would be given an opportunity to offer other evidence, and said chairman requested him to let the matter stand over for a time as he had pressing matters which demanded his personal attention; that at all times before he was notified on December 18th by mail that his request had been denied he was made to believe that there was no objection to the sufficiency of his request and that it would be granted.

The respondent makes no denial of the above averments with respect to reopening the case for the introduction of further evidence. The attorney for The State Bar apparently admits the truth of the above averments and seeks to avoid their effect by the claim that the committee was justified in denying the request because of an "obvious insufficient showing". He further argues that any statements made by the chairman of the committee "are not binding upon the committee as a whole".

We are not in agreement with the above statement as a general proposition. If it should appear as a fact that an accused in a disciplinary proceeding was told by the chairman of the committee that he would be granted a postponement of his case, or an order would be made reopening his case and he, in good faith relying upon such assurance, should suffer any prejudice or detriment by reason of said assurance being withdrawn or denied, it would be the plain duty of a reviewing court to see to it that he was not misled to his prejudice thereby, whether the application had been made in strict compliance with the statute or not. The Rules of Procedure of The State Bar provide that in investigations, hearings and in all other matters before the board or a committee the proceedings shall be informal, but thorough, with the object of ascertaining the truth. (Rule 28.) The accused complains that the long delay following the submission of the case was contrary to rule No. 30, which makes it the duty of the committee to proceed to a prompt hearing, to make findings and to report promptly to the board, and was not occasioned by any fault of his and the case could have been reopened and closed within the time which elapsed between June 13th and December 18th, on which last-mentioned day the order denying leave to produce other evidence was denied. The accused complains that his case was prejudiced by this delay of six months. The accused filed

his opposition to the committee's report on February 16, 1934, within the ten-day period allowed by law.

The findings of fact as made by said committee were approved and adopted by the board of bar governors, and it concluded therefrom that the accused had been guilty of a violation of rule 2 of the Rules of Professional Conduct. The recommendation of the committee as to disbarment was rejected and instead the board recommended suspension for a term of one year. If the board were satisfied with the committee's findings of fact, which were adopted by it, it would seem that the extreme penalty provided by the Bar Act and as recommended by the committee, which was disbarment, should not have been modified. The findings of the committee contain an unusually caustic arraignment of the accused both as a member of society and as a lawyer. As a conclusion from its findings, to which we will hereafter refer, the committee expressly stated that it gave no credence to the several witnesses produced by the accused and who were or had been his clients and none to those who were not his clients, as the latter class, according to the findings, were induced by prejudice instilled by the accused to testify against Rutherford. No credence whatever was given to the testimony of the accused. No questions were asked him but one, at the close of his extended statement with respect to his contact with Rutherford, which is not of sufficient importance to require a restatement. As a conclusion from its findings the committee thus closes its recommendation: ''The committee also feels that an attorney as well acquainted and as influential with the criminal element as respondent has shown himself to be and who has been and is capable and willing to use such acquaintance and influence to his own advantage in obtaining perjured testimony and in intimidating witnesses adverse to him, is not only a discredit to the profession but a menace to society in general.''

The accused appeared before said board on February 16, 1934, and vigorously attacked said findings and recommendation of the committee and board in his written opposition to the above report of the committee and made an application to present additional evidence and for a hearing *de novo*. On the following day both applications were denied. The accused insists that the committee was unalterably prejudiced against him from the first and should not have sat

in judgment in the matter. His claim is that he is engaged exclusively in defense of persons charged with crime; that during his sixteen years of practice he has necessarily antagonized the officers engaged in the prosecution of persons charged with crime and the public defenders and that long and deep-seated animosities existing on the part of such persons have caused them to harass him to the extent that seven to eight charges calculated to cripple him and finally drive him from the practice of the law have been lodged against him without success; that during his entire course as an attorney he has never tried a personal injury case and has had but ten divorce cases and has never by improper methods solicited business or engaged in ambulance chasing. He boldly challenges his enemies to prove the contrary, or to prove him guilty of a single dishonest act. His practice is confined to the less desirable branch of the practice and is commonly known as police court practice. He asserts that eighty per cent of his work is devoted to charity for which he receives no remuneration. The accused makes specific reference to members of the committee and cites incidents upon which he relies as evidence sufficient to disqualify said members from sitting in judgment upon his case. The accused, however, made no objections to any committeeman on the grounds of prejudice when the matter was called for hearing, and we are not disposed to pursue the question any further in view of our determination of the matter.

The sole charge lodged against the accused was that he solicited employment from one Rutherford, a prisoner awaiting trial on charges of robbery. This charge grew out of the activity of Mock Jock, a Chinese client of the accused, detained, it appears, for the violation of some federal statute. Several other inmates, among a large number of persons awaiting examination or trial, were or had been the clients of the accused. The Chinese in question had in his possession an old political card bearing the likeness of the accused and which he had circulated when a candidate for the office of judge of the municipal court at a past election. At the time this proceeding was heard said Chinese had been transferred as a federal prisoner to the Santa Clara County jail and did not testify at the hearing. But it is admitted that said Chinese presented this card to Rutherford on April

24th and told him that the accused was a successful lawyer. It was the custom for persons charged with crime who wished to see a lawyer to write their names on a card which was delivered to the lawyer whom they wished to consult. Rutherford admittedly wrote his name on the card bearing the accused's name and picture and returned it to the Chinese. It was delivered to the accused, who had no acquaintance with Rutherford, and on the following day the accused, apparently in compliance with the rule of the jail, had Rutherford brought out for consultation. Rutherford had been held over on April 13th on a charge of robbery. His codefendants had admitted the commission of the crime. The attorney who had represented Rutherford at the preliminary examination, and who had no legal duty to do so, had not visited him. Ten days had passed and Rutherford had become worried as to his fate.

It is very convincing from the testimony of Rutherford himself that he told both the accused and several of his prison mates that he did not know whether Mr. O'Donnell had been retained to defend him or not. His half admissions of the fact and evasive answers on the question make it very certain that he did not know that any arrangements had been made for his defense, and that he was uneasy and was anxious to confer with the accused. The admitted fact that he wrote his name on a card handed to him by the Chinese, who was unable to write, which he knew was to be delivered to the accused is quite conclusive proof of that fact. He admits that he told the accused that he did not know for sure whether Mr. O'Donnell was retained. There is ample proof in the case from several sources that he requested an interview with the accused, and his act in doing so forms the basis for this proceeding. He admitted that he fully explained his case to the accused which is wholly inconsistent with any doubtful denial by him that he requested an interview with the accused looking to his defense. It further appears from his testimony that he gave to the accused Miss Corville's address. When asked if he did not request the accused to go to see her and ask her to come and see him, Rutherford answered: "I told him he would have to go out and see her if he was to be retained." The accused called on Miss Corville the same evening and informed her that he had come to talk to her about Mr. Rutherford. Her tes-

timony is that she informed him she already had an attorney and the accused said: ''O'Donnell is a civil attorney; he is not a criminal lawyer and you have the wrong attorney. If he handles his case in the way he is going to he will send this boy to San Quentin for fourteen years.'' He said he had forty cases and had been successful in most of them, and that O'Donnell was hardly ever seen in the criminal courts. The accused said that he knew the ins and outs of the criminal practice. Miss Corville admits that he did not ask her for employment or say anything to her about a fee. The accused asked her if she would go and visit Rutherford and she said she would and added that she would also see Mr. O'Donnell. The accused said, ''All right, you do that.'' He then left. Both Miss Corville and Mr. O'Donnell visited Rutherford on the following day after the accused had visited Miss Corville. The accused called on Rutherford after the visit of O'Donnell, as he was expected to do, and Rutherford told him he had decided to keep Mr. O'Donnell.

It is upon Rutherford's testimony that the charge of solicitation of employment rests. As above related, he was being held on a charge of robbery committed, by force of arms. It developed in the case that he was hoping for probation on a plea of guilty. The accused understood that Rutherford was contemplating entering a plea of guilty with the expectation of being released on probation. That such negotiations were pending, of which the accused was not fully informed, is very clear from the record and from the fact that a few days after he testified against the accused he was permitted to enter a plea of guilty of second degree robbery and was granted probation. The accused understood that Rutherford was to plead guilty to the charge as made and he told him if he entered such a plea he would be sentenced to the penitentiary inasmuch as the law provides (sec. 1203, Pen. Code) that probation shall not be granted to persons who in the perpetration of robbery use a deadly weapon in accomplishing the crime. Such is the law as to first degree robbery. The accused contends that was what he had reference to when he told Miss Corville and Rutherford that if his attorney handled Rutherford's case ''in the way he is going to he will send this boy to San Quentin for fourteen years''. Rutherford testified that the accused had

solicited employment from him by boasting of his skill as a criminal lawyer and minimizing the experience of O'Donnell as a criminal lawyer. He admits that the accused did not ask him for a fee or directly seek employment, but used methods which had the tendency to persuade him that he would be better protected by employing him. As before stated, Rutherford's admission that he wrote his name on a card which he doubtless knew was to be sent to the accused and which constituted the customary jail method of requesting a conference with the lawyer to whom the card was to be presented is conclusive against him. His explanation to the effect that he did sign the card, but did not intend that it would be delivered to the accused is exceedingly weak. Besides, another inmate testified to a similar incident in which Rutherford's name appeared upon a card to be delivered to the accused. The five witnesses here referred to, not including the accused, testified to the desire expressed by Rutherford to interest the accused in his defense. The logic of the situation as detailed by the evidence gives force to the claim that the accused was first solicited by Rutherford. A short time after it became certainly known that Mr. O'Donnell was to represent Rutherford thenceforward, charges were filed against Ewell. Naturally it became known to the inmates of the jail that Rutherford, who was then an applicant for probation, had appeared as one of the complainants against Ewell in the solicitation charge. Ewell showed the complaint to the prison mates of Rutherford who were familiar with the transactions between Rutherford and himself. The prisoners who had been companions of Rutherford and who had been a part of said transaction became incensed at Rutherford at what they asserted were false charges and accused him of being influenced to perjure himself in the hope of receiving immunity.

Some remarks on the part of one or two of said prison mates as testified to by Rutherford were to the effect that Rutherford, because of his part in preparing false charges against the accused, should be or would be thrown off the tier (elevated cell floor) or should receive personal chastisement. No violence or uprising of any kind resulted from the conduct of Rutherford by reason of joining forces with Ewell's prosecution. There is no sufficient evidence in the record which would justify a finding that Ewell, the accused,

attempted to incite Rutherford's prison mates against him or that he did more than a person so accused would have done to collect evidence in his defense. He interviewed the only persons who were witnesses to the transaction, informed them of the charges Rutherford had placed against him and gave them a copy of the charges in writing. Naturally he would go to the only persons who had knowledge of the transaction for evidence. The matter was wholly a prison affair. There is nothing in the record to sustain the finding that he was well acquainted with or unusually influential with the criminal element. The only evidence from which such an inference could be drawn is that he was acquainted with his two clients and through them be became known to the other two who had been represented by other lawyers. That he influenced any witnesses to testify in his behalf cannot be said with any greater degree of certainty or plausibility than it may be said that Rutherford, who had admitted a participation in a serious crime, and whose testimony is not more convincing than that of his prison mates, was influenced to give prejudiced or perjured evidence against the accused in the hope that he might receive probation, which act really came to pass.

After Rutherford had been permitted to plead guilty to second degree robbery and was granted probation against the recommendation of the probation officer, the accused undertook to appeal from the order. His objection to granting probation was that Rutherford had committed first degree robbery by the use of arms and was by express provision of law denied the right of probation. The attempted appeal from the order granting probation, not being supported by the district attorney or attorney-general, was dismissed inasmuch as the only person who may represent the People in the conduct of criminal proceedings or in matters arising out of public prosecutions is the district attorney or the attorney-general. The committee found that the accused did not act in good faith in taking said appeal and that he was actuated solely by a malicious purpose in harassing said Rutherford in violation of rule No. 13.

There can be no doubt that the accused did feel resentment against Rutherford, who had become informer and witness against him under the circumstances which he and the witnesses to the transaction claimed to have been truly set

forth by them. He sought to prevent Rutherford, whom he claimed had testified falsely against him, from enjoying probation, which testimony he claimed was induced by the hope of gaining probation. His contention was that a second degree plea could not be accepted where the evidence showed deadly weapons were used in the commission of the crime. He presented his contention in open court, but it was unsuccessful. We are satisfied that he had no standing to urge the appeal. There appears to be little doubt as to the sincerity with which he urged his appeal. There is also no doubt that his contention that he had a right to prosecute the appeal was unsound. His pique may have affected his judgment. But it cannot be said that his misguided effort under the ciircumstances should be punished with suspension for one year.

We are of the view, however, that the accused should not have relied merely upon the word of Rutherford as to whether an attorney had been provided for him in view of the fact that an attorney had represented him at the preliminary. Although it does not so appear from the record in express language, it should have occurred to the accused that it was likely that arrangements for retaining Mr. O'Donnell to represent Rutherford at subsequent proceedings had not been concluded and that it was because of pending negotiation with Miss Corville that Mr. O'Donnell had not made definite announcement as to whether he would continue as his attorney. In other words, the accused should, under the circumstances, have communicated with Mr. O'Donnell and obtained definite information on the subject before he assumed to advise Rutherford. His act no doubt constituted an infraction of the rules providing for the improvement of the practice of the law.

Upon a full examination of the record we are satisfied that a suspension for a period of three months is adequate punishment for the infraction complained against.

It is therefore ordered that said Raine Ewell be suspended from the practice of law in all the courts of this state for a period of three months dating from the day this decision shall become final.

Curtis, J., Preston, J., and Langdon, J., concurred.

WASTE, C. J., Dissenting.—I dissent. In view of the record in this case, and particularly in view of the findings of The State Bar, I am of the opinion that the recommendation of the board of governors that the petitioner be suspended from the practice of the law for a period of one year should be approved.

Shenk, J., concurred.

Rehearing denied.